**PFIZER, INC.**

v.

**FOOD AND DRUG ADMINISTRATION.**

**Civ. No. HM–88–1019.**

United States District Court,
D. Maryland.

Oct. 5, 1990.

Richard M. Barnes and Charles P. Goodell, Jr., Baltimore, Md., Peter Barton Hutt, Herbert Dym, Bruce N. Kuhlik, Covington & Burling, Washington, D.C., George W. Evans, Marvin R. Frank and Peter C. Richardson, New York City, for plaintiff.

Glenda G. Gordon, Asst. U.S. Atty., John R. Bolton, Asst. Atty. Gen., Baltimore, Md., Kenneth L. Jost, Civ. Div., U.S. Dept. of Justice, Thomas Scarlett, Chief Counsel, and Mary K. Pendergast, Asso. Chief Counsel, Food and Drug Admin., Rockville, Md., for defendant.

## ORDER

HERBERT F. MURRAY, Senior District Judge.

After the parties filed cross-motions for summary judgment, this case was referred to United States Magistrate Catherine C. Blake for rulings on those motions. Magistrate Blake issued a Report and Recommendation on October 2, 1989. Having conducted a *de novo* review of the file, the Magistrate's Report and Recommendation, and the plaintiff's objections thereto, this Court is prepared to rule and will adopt the Magistrate's Report in full.

In its Objection to the Magistrate's Report, plaintiff generally reiterates the arguments made in support of plaintiff's motion for summary judgment. Essentially, plaintiff challenges as erroneous the FDA's interpretation of the term "drug" in § 355(b)(1) and (c)(2) of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301, *et seq.* The FDA interprets the word "drug" as used in these sections to mean the "drug product" for which the new drug application ("NDA") was filed. Pfizer contends that the term "drug" in this context refers to both the drug substance (active ingredient) and the drug product. On this basis, Pfizer seeks declaratory and injunctive relief compelling FDA to accept and publish patent information on unapproved tablet formulations of nifedipine.

Plaintiff's argument is without merit. This Court agrees with the Magistrate that the FDA's interpretation is not only reason-

able but also consistent with the language of the statute, Congressional intent, prior judicial interpretations of § 355, and the agency's own regulations.

Accordingly, it is this 5th day of October, 1990, by the United States District Court for the District of Maryland,

ORDERED:

(1) that the Magistrate's Report and Recommendation be, and the same hereby is, *Affirmed and Adopted in full and incorporated herein;*

(2) that defendant FDA's cross-motion for summary judgment be, and the same hereby is, *Granted;*

(3) that plaintiff Pfizer's motion for summary judgment be, and the same hereby is, *Denied;*

(4) that judgment be, and the same hereby is, *Entered in favor of defendant FDA.*

## MAGISTRATE'S REPORT AND RECOMMENDATION

### Oct. 2, 1989

CATHERINE C. BLAKE, United States Magistrate.

This case has been referred to me by Judge Herbert F. Murray pursuant to 28 U.S.C. § 636(b) and Local Rule 80 (now Local Rule 301) for a report and recommendation on pending summary judgment motions. Oral argument was heard on May 10, 1989. For the reasons set forth below, I will recommend that Pfizer's motion for summary judgment be denied and the FDA's cross motion for summary judgment be granted.

Under the Federal Food, Drug and Cosmetic Act ("the Act"), 21 U.S.C. § 301, *et seq.*, a "new drug" is defined as "any drug ... the composition of which is such ..." that it is not generally recognized by qualified experts as safe and effective for use under the conditions recommended in its labeling. 21 U.S.C. § 321(p)(2). Before a

new drug may be marketed in the United States, the Food and Drug Administration ("FDA" or "agency") must approve a new drug application ("NDA") submitted by the manufacturer. 21 U.S.C. § 355(a).

In addition to other information, the NDA must include a "full list" of "components" of the drug, a "full statement" of the "composition" of the drug, and extensive information on studies done to show that the drug is both safe and effective. 21 U.S.C. § 355(b). The agency is required to publish a list of "the official and proprietary name" of each drug approved for safety and effectiveness ("listed drug"), 21 U.S.C. § 355(j)(6), which it does in a publication entitled *Approved Drug Products* (the "Orange Book"). (*See* FDA's Motion for Summary Judgment, Affidavit of Robert A. Bell, Exhibit 5). Information concerning both the safety and the effectiveness of new drugs has been required under the Act since 1962. *See Weinberger v. Hynson, Westcott & Dunning, Inc.,* 412 U.S. 609, 613–14, 93 S.Ct. 2469, 2475, 37 L.Ed.2d 207 (1973).

Once a drug has been approved and listed, another drug manufacturer may seek FDA marketing approval for an identical or closely similar product (a "generic" drug) by submitting and having approved an abbreviated new drug application ("ANDA"). 21 U.S.C. § 355(j). The Drug Price Competition and Patent Term Restoration Act, Pub.L. No. 98–417, generally known as the "Hatch–Waxman Amendments", enacted on September 24, 1984 (the "1984 Amendments"), significantly relaxed the ANDA procedures. The 1984 Amendments permitted a manufacturer of a generic drug to rely on the safety and effectiveness data submitted by the "pioneer" drug manufacturer with its NDA for the previously approved drug.[1]

Specifically, a manufacturer wishing to submit an ANDA for a non-identical copy of a listed drug must first submit a "suita-

---

**1.** The 1984 Amendments also allowed a generic manufacturer to use a patented drug, before the patent expired, in tests necessary to prepare an ANDA. *See* 35 U.S.C. § 271(e). This set aside the ruling in *Roche Products v. Bolar Pharma-* *ceutical Co.,* 733 F.2d 858 (Fed.Cir.), *cert. denied,* 469 U.S. 856, 105 S.Ct. 183, 83 L.Ed.2d 117 (1984). At the same time the filing of an ANDA was made an act of infringement.

bility" petition to the FDA, which shall be approved unless the FDA determines that new safety and effectiveness studies are necessary. 21 U.S.C. § 355(j)(2)(C).[2] If the petition is approved, the ANDA may be filed, and the manufacturer may rely on the safety and effectiveness data submitted with the pioneer drug's NDA. The manufacturer, however, must supply with the ANDA evidence showing the new generic drug is "bioequivalent" to and can be expected to have the same therapeutic effect on patients as the listed drug. 21 U.S.C. § 355(j)(2)(A)(iv).

The purpose of the 1984 Amendments was to facilitate the approval of generic drugs, thus making available more low-cost drugs to the public. As compensation to the pioneer drug manufacturer for sharing its safety and effectiveness data, and as an incentive for new drug research, the 1984 Amendments also provided varying periods of non-patent marketing exclusivity for drugs approved after December 31, 1981, and protections in the form of limited patent extensions under certain circumstances. *Mead Johnson Pharmaceutical Group v. Bowen*, 838 F.2d 1332, 1333 (D.C.Cir.1988), *Norwich Eaton Pharmaceuticals v. Bowen*, 808 F.2d 486, 488 (6th Cir.), *cert. denied*, 484 U.S. 816, 108 S.Ct. 68, 98 L.Ed.2d 32 (1987); *Abbott Laboratories v. Young*, 691 F.Supp. 462, 464 (D.D.C.1988); *Glaxo, Inc. v. Heckler*, 623 F.Supp. 69, 72 (E.D.N.C.1985).

In order to ensure that the holder of an NDA receives the patent protection it is entitled to, the 1984 Amendments also provide that an applicant for an NDA:

shall file with the application the patent number and the expiration date of any patent which claims the drug for which the applicant submitted the application or which claims a method of using such drug[3] and with respect to which a claim of patent infringement could reasonably

be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug.... Upon approval of the application, the Secretary shall publish [such] information....

21 U.S.C. § 355(b)(1). An applicant for an ANDA seeking to rely on the safety and effectiveness data previously submitted in connection with a listed drug must file:

"a certification ... with respect to each patent which claims the listed drug ...

(I) that such patent information has not been filed,

(II) that such patent has expired,

(III) of the date on which such patent will expire, or

(IV) that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted....

21 U.S.C. § 355(j)(2)(A)(vii). If the ANDA applicant files a certification under subclause (IV), it must also give notice to the patent owner and the holder of the NDA for the listed drug. 21 U.S.C. § 355(j)(2)(B)(i). If an action for patent infringement is filed within 45 days thereafter, the FDA must withhold approval of the ANDA for up to 30 months while the court action is pending. 21 U.S.C. § 355(j)(4)(B)(iii).

In 1981, the FDA approved Pfizer's NDA for nifedipine solution in a soft gelatin capsule, which Pfizer markets in the United States under the trade name Procardia. Nifedipine is recognized as a valuable therapeutic agent in the treatment of angina. After enactment of the 1984 Amendments, the FDA directed holders of previously approved NDA's to submit patent information as required under 21 U.S.C. § 355(c)(2).[4] Pfizer submitted, and the FDA accepted for filing, information concerning patent number 3,644,627 (the " '627 patent"), which claims the drug substance nifedipine and its use in treating diseases

---

**2.** Suitability petitions are required where the new drug has a different active ingredient, route of administration, dosage form or strength from the listed drug. *Id.*

**3.** The parties agree that this case does not involve a "use" patent.

**4.** 21 U.S.C. § 355(c)(2) tracks the language of § 355(b)(1) in requiring certain patent information as to new drug applications filed before the 1984 Amendments took effect.

of the circulation and angina pectoris, and patent number 3,784,684 (the " '684 patent"), which claims nifedipine solution in an oral release capsule. The '627 patent expires in 1989; the '684 patent expires in 1991. Both patents were published in the Orange Book with the listing for Procardia. (*See* Pfizer's *Motion for Summary Judgment*, Declaration of John E. Wolleben, and Exhibits 1–3 attached thereto).

Pfizer also submitted patent number 4,412,986 (the " '986 patent"), which claimed a tablet formulation of nifedipine. That patent does not expire until the year 2000. (*Id.*, Exhibits 2, 4 and 6). The FDA, however, refused to publish that patent without a certification from Pfizer that the drug and the formulation or composition of the drug claimed by the patent was currently approved under 21 U.S.C. § 355. In a letter dated July 29, 1985, the FDA stated:

> This policy was established to implement the statutory requirement that the formulation or product patent must apply to an approved product. Thus, a patent for a formulation that has never been approved may not be listed by FDA. We will not publish the patents pending receipt of your certification.

(*Id.*, Exhibit 6). Because Pfizer has neither filed nor had approved an NDA for a tablet formulation of nifedipine, it could not provide the required certification as to the '986 patent.

In October 1987, Par Pharmaceutical, Inc. ("Par") filed a suitability petition with the FDA pursuant to 21 U.S.C. § 355(j)(2)(C) seeking permission to file an ANDA for a non-identical copy of Pfizer's approved nifedipine gel capsule. Par's proposed ANDA was for nifedipine in a tablet formulation. The "listed drug" Par referred to in its suitability petition was Pfizer's nifedipine capsule, Procardia. The FDA approved the petition on December

11, 1987. (Affidavit of Robert Bell, Exhibit 4).

On December 22, 1987, Pfizer filed a citizen petition under 21 C.F.R. § 10.25(a)(2) and § 10.30, requesting the FDA to declare "that patents claiming formulations of a drug which contain an active ingredient which is the subject of a pending or approved application may be filed" with the FDA under 21 U.S.C. § 355(b)(1) and (c)(2), and specifically asking the FDA to accept for filing information on the '986 patent and another patent number 4,562,-069 (the " '069 patent"), both of which claim nifedipine in tablet formulation. (A.R. 2).[5] As noted, the '986 patent expires in 2000; the '069 patent expires in 2003. Pfizer does not market those formulations in the United States and has never submitted an NDA for either.[6] On January 19, 1988, Pfizer filed an amendment to its petition seeking a decision by March 15, 1988. (A.R. 62).

Par filed comments on Pfizer's citizen petition on February 24, 1988, supporting the FDA's position (A.R. 65), and Pfizer filed a reply on March 7, 1988 (A.R. 97).[7] On March 30, 1988, the FDA denied the petition. (A.R. 107–112).

In denying the petition, the FDA relied on its interpretation of the patent filing provisions in 21 U.S.C. § 355(b)(1) and (c)(2), which require information to be filed on "any patent which claims the drug for which the applicant submitted the application." The FDA interprets the term "drug" as used in § 355(b)(1) and (c)(2) to mean the "drug product" for which the NDA was filed, arguing that although an NDA must include information on the active ingredient or "drug substance" involved, an approved NDA covers only a specified drug product, which is then published in the list of "Approved Drug Products" issued by the FDA. (A.R. 109). The FDA further relied on the statutory language requiring an ANDA applicant to file

---

**5.** "A.R." refers to the administrative record submitted with the FDA's motion for summary judgment.

**6.** Pfizer also has a pending patent application for another tablet formulation of nifedipine.

(Pfizer's Motion for Summary Judgment, Declaration of John E. Wolleben).

**7.** Par also filed an amicus brief in this case, which has been considered.

a patent certification only as to the "listed" drug to which it refers in its application. Therefore, even if the FDA accepted Pfizer's patents on its unapproved tablet formulations for filing, the "listed" drug would be the approved capsule form of nifedipine, and Par would have to submit a certification as to the patents claiming the listed drug only. (A.R. 109–110).

Finally, the FDA considered the purposes of the 1984 Amendments and concluded that "Congress intended to provide enhanced market protection only to those products for which an NDA applicant has submitted safety and effectiveness information, which can in turn be relied upon by a ANDA applicant." Pfizer submitted such data only for its capsule; it would receive all the patent protection on its gel capsule to which it is entitled under the Act. (A.R. 110). Accordingly, on March 30, 1988, the FDA denied Pfizer's petition and refused Pfizer's request for a stay of approval of the Par ANDA for nifedipine tablets.

On April 5, 1988, Pfizer filed the complaint in this case, seeking a declaratory judgment that patents claiming nifedipine in tablet formulations may be filed with the FDA under 21 U.S.C. §§ 355(b)(1) and (c)(2), and an injunction requiring the FDA to accept such patents. The action arises under 21 U.S.C. § 355 and the Administrative Procedure Act, 5 U.S.C. §§ 551–706. Pfizer claims that the FDA's decision, which constitutes final agency action under 21 C.F.R. § 10.45(d), was contrary to law. *See* 5 U.S.C. § 706(2)(A).

As stated by the D.C. Circuit in a case involving the FDA's interpretation of a different provision of the Amendments:

This case presents "a pure question of statutory construction, [on which] our first job is to try to determine congressional intent, using 'traditional tools of statutory construction.' If we can do so, then that interpretation must be given effect...." *NLRB v. United Food & Commercial Workers Union, Local 23,* 484 U.S. 112, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987) (quoting *INS v. Cardoza–Fonseca,* 480 U.S. 421, 107 S.Ct.

1207, 1221, 94 L.Ed.2d 434 (1987)). If, on the other hand, "the statute is silent or ambiguous with respect to the specific issue," *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984), then the question for us becomes whether the FDA's construction of the statute is "permissible," *id.,* that is, one that is "rational and consistent with the statute." *United Food & Commercial Workers,* 108 S.Ct. at 421.

*Mead Johnson Pharmaceutical Group v. Bowen, supra,* 838 F.2d at 1335–1336. In a similar context, the Sixth Circuit stated:

"An agency's construction of a statute it is charged with enforcing is entitled to deference if it is reasonable and not in conflict with the expressed intent of Congress." *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 131, 106 S.Ct. 455, 461, 88 L.Ed.2d 419 (1985) (citations omitted); *see also Aluminum Co. of America v. Central Lincoln Util. Dist.,* 467 U.S. 380, 389, 104 S.Ct. 2472, 2479, 81 L.Ed.2d 301 (1984). "[I]t is not necessary that the agency's construction of the statute be the only permissible one. Rather, its construction 'must be upheld unless that view is plainly *unreasonble.*'" *Ohio v. Ruckelshaus,* 776 F.2d 1333, 1339 (6th Cir.1985) (quoting *National Steel Corp. v. Gorsuch,* 700 F.2d 314, 321 (6th Cir.1983)), *cert. denied,* 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 977 (1986).

*Norwich Eaton Pharmaceuticals v. Bowen, supra,* 808 F.2d at 491. *See also Hillsborough County v. Automated Medical Laboratories,* 471 U.S. 707, 714–715, 105 S.Ct. 2371, 2375–76, 85 L.Ed.2d 714 (1985); *United States v. Rutherford,* 442 U.S. 544, 551–54, 99 S.Ct. 2470, 2474–76, 61 L.Ed.2d 68 (1979) (upholding FDA interpretation of the term "new drug").

In this case, the agency's interpretation is not only reasonable but also consistent with the statutory language, the intent of Congress, prior judicial interpretations of § 355, and the agency's own regulations.

The first element to be considered is the language of the statute. The word "drug" is defined in the statute as follows:

> The term "drug" means (A) articles recognized in the official United States Pharmacopoeia, official Homeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; and (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and (D) articles intended for use as a component of any article specified in clauses (A), (B), or (C) of this paragraph; but does not include devices or their components, parts, or accessories.

21 U.S.C. § 321(g)(1). This definition covers both a finished "drug product" and its active and inactive ingredient or ingredients. *United States v. Generix Drug Corp.*, 460 U.S. 453, 459, 103 S.Ct. 1298, 1301, 75 L.Ed.2d 198 (1983).

The statutory provision at issue is 21 U.S.C. § 355, which relates to the approval of "new drugs." [8] Applications for FDA approval must be filed for any new drug a manufacturer wishes to market in the United States. 21 U.S.C. § 355(a). As noted earlier, safety and effectiveness data must be filed with the new drug application. 21 U.S.C. § 355(b). The patent information required to be filed relates to "any patent which claims the [new] drug *for which the applicant submitted the application.*" 21 U.S.C. § 355(b)(1) and (c)(2) (emphasis added).

Pfizer asserts that because the definition of a "drug" includes the components of a drug product, the word "drug" as used in 21 U.S.C. § 355(b)(1) and (c)(2) must mean active ingredients (in this case nifedipine) as well as drug products (Procardia); Pfizer further asserts that any patent claiming a drug product which contains the active ingredient nifedipine therefore must be filed pursuant to 21 U.S.C. § 355.

The meaning of the word "drug" in 21 U.S.C. § 355(b)(1) and (c)(2) cannot be determined apart from its context. Neither the FDA nor this court disputes that the definition of drug in § 321(g) covers both drug products and active ingredients. The relevant statutory section in this case, however, modifies the word "drug" by attaching the phrase "for which the applicant submitted the application." In that context the FDA's interpretation of drug as meaning drug product is consistent with and indeed required by the statute. Pfizer has submitted an NDA for Procardia (*see* FDA's Reply, Attachment A); not for nifedipine in isolation and not for the tablet formulations claimed by the '986 and '069 patents.

The other provisions of § 355(b) also are consistent with the interpretation of drug as drug product. For example, the statute requires that an NDA contain a "full list" of "components" of the drug, a "full statement" of the "composition" of the drug, and "samples" of the drug "and of the articles used as components thereof." 21 U.S.C. § 355(b)(1)(B), (C) and (E). Those requirements make sense in connection with a drug product, but not when applied

---

**8.** The term "new drug" is defined as:

> (1) Any drug (except a new animal drug or an animal feed bearing or containing a new animal drug) the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof, except that such a drug not so recognized shall be deemed to be a "new drug" if at any time prior to the enactment of this chapter it was subject to the Food and Drugs Act of June

30, 1906, as amended, and if at such time its labeling contained the same representations concerning the conditions of its use; or

> (2) Any drug (except a new animal drug or an animal feed bearing or containing a new animal drug) the composition of which is such that such drug, as a result of investigations to determine its safety and effectiveness for use under such conditions, has become so recognized, but which has not, otherwise than in such investigations, been used to a material extent or for a material time under such conditions.

21 U.S.C. § 321(p).

to an active ingredient alone.[9]

Further, the FDA's list of approved drugs, as required by statute, contains those for which an NDA was filed and approved. 21 U.S.C. § 355(j)(6)(A). That list includes Procardia, but not nifedipine in isolation or either of Pfizer's tablet formulations. (*See* FDA's Motion for Summary Judgment, Affidavit of Robert Bell, Exhibit 5). Accordingly, the "listed" drug to which Par refers in its ANDA properly can be only Procardia, and the certification required under 21 U.S.C. § 355(j)(2)(A)(vii) must relate only to patents which claim the drug product Procardia.[10]

The FDA's interpretation of the term "drug" in § 355 as meaning a particular drug product is consistent with the intent of Congress in enacting both a streamlined approval process for generic drugs and additional marketing protection for pioneer drugs, under certain circumstances. The legislative history of the 1984 Amendments indicates that Congress was concerned about extending patent protection for pioneer drugs where the necessary regulatory delay to obtain FDA approval before marketing had effectively shortened the period of protection otherwise afforded by the patent. *See* H.R.Rep. No. 857 at 2648. Congress also wished to compensate pioneer manufacturers for the public benefit provided by allowing generic copiers to rely on the pioneer's safety and effectiveness data. Congress determined, however, that the appropriate cutoff date for certain protections was January 1, 1982; drugs approved before that date were not entitled to the additional non-patent "exclusivity" period created by the 1984 Amendments.[11] *Mead Johnson Pharmaceutical Group v. Bowen, supra; Norwich Eaton Pharmaceuticals v. Bowen, supra; Roche Products v. Bolar, supra,* 733 F.2d at 865; *Abbott Laboratories v. Young, supra; Glaxo, Inc. v. Heckler, supra.*

Procardia was approved in 1981. The only additional protection at issue in this case is the notice of ANDA filing and the automatic 30–month stay for patent infringement litigation Pfizer could obtain if the FDA accepted for filing its patents on the unapproved tablet formulations.[12] There is nothing in the legislative history to indicate that Congress intended to provide that protection as to a product Pfizer has chosen not to make available to the American public.[13] Procardia, the approved product, and nifedipine, its active ingredient, have received all the protection Congress determined to provide them under the 1984 Amendments.

Pfizer has submitted in support of its position a letter from Senator Orrin G. Hatch to FDA Commissioner Frank E. Young, dated May 3, 1988, and a letter from Representative Edward R. Madigan to the Commissioner dated June 16, 1988. With all due respect to the authors of those letters, courts consistently have refused to determine legislative intent from later or even contemporaneously expressed opinions of individual legislators. While House and Senate reports may be consulted, reliance on the correspondence submitted by Pfizer would not be proper. *See United*

---

9. *See also* H.R.Rep. No. 857, 98th Cong., 2nd Sess. 21–22, *reprinted in* 1984 U.S.Code Cong. & Adm.News 2647, 2654–55 (hereinafter "H.R.Rep. No. 857").

10. *See also* H.R.Rep. No. 857 at 2654, explaining that:

> the focus of the [1984 Amendments] is to provide the Food and Drug Administration with sufficient information to assure that the generic drug is the same as the listed drug that has previously been determined to be safe and effective.

11. It should also be noted, as further evidence of Congressional intent, that the patent extension now available for regulatory delay under 35 U.S.C. § 156 applies only to active ingredients of drug products. *See* 35 U.S.C. § 156(f). Although it could have, Congress chose not to extend the patent protection for all patents claiming formulations which contained the active ingredient developed by the pioneer.

12. The 30–month period may be shortened by the court with jurisdiction over the patent litigation. 21 U.S.C. § 355(j)(4)(B)(iii).

13. Pfizer may have good reasons for not marketing a tablet; Par apparently has reason to believe it would be a useful product. Ultimately, the physicians who prescribe either Procardia or Par's tablet, if it is marketed, must make the choice for their patients.

**178**

*States v. Clark,* 445 U.S. 23, 33 n. 9, 100 S.Ct. 895, 902 n. 9, 63 L.Ed.2d 171 (1980); *South Carolina Educ. Ass'n v. Campbell,* 883 F.2d 1251 (4th Cir.1989); *Blitz v. Donovan,* 740 F.2d 1241, 1247 (D.C.Cir.1984). The final form of the legislation undoubtedly was a compromise among the views of many legislators, some of whom might disagree with Senator Hatch and Congressman Madigan.

Prior to the enactment of the 1984 Amendments, the Supreme Court had recognized the FDA's interpretation of "drug" in the context of 21 U.S.C. § 355 as meaning the drug product for which approval was sought. In *USV Pharmaceutical Corp. v. Weinberger,* 412 U.S. 655, 664, 93 S.Ct. 2498, 2504–05, 37 L.Ed.2d 244 (1973), the Court stated:

> It is true that an NDA covers a particular product or products that it names and that [21 U.S.C. § 355] when applied to an NDA is personal to the manufacturer who files it. Section [355], in other words, addresses itself to drugs as individual products.

■ Congress is assumed to know the judicial or administrative gloss given to particular statutory language, and therefore is assumed to have adopted the existing interpretation unless it affirmatively indicates otherwise. *Cannon v. University of Chicago,* 441 U.S. 677, 696–698, 99 S.Ct. 1946, 1957–58, 60 L.Ed.2d 560 (1979); *Blitz v. Donovan, supra,* 740 F.2d at 1245, *quoting Florida Nat. Guard v. Federal Labor Relations Auth.,* 699 F.2d 1082, 1087 (11th Cir.), *cert. denied,* 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983). This assumption may not be realistic unless the agency's construction has been brought to public attention. *United States v. Rutherford, supra,* 442 U.S. at 554 n. 10, 99 S.Ct. at 2476 n. 10. In this case, the agency's construction has been made well-known through the regulations it adopted concerning new drug applications under 21 U.S.C. § 355. *See generally* 21 C.F.R. § 314.1 *et seq.* (1984). Congressional familiarity with the regulations is evidenced by the Committee's statement in its report that it intended to "clarify" the interpretation of 21 C.F.R. § 314.14(f)(5). H.R.Rep. No. 857 at 2668.

Pfizer claims that the FDA has been inconsistent regarding its interpretations of the 1984 Amendments. In support of this claim, Pfizer states that on November 16, 1984 (shortly after the 1984 Amendments became effective), the FDA issued a letter to "interested persons" stating that it intended to publish in the *Approved Products List* only patents on active ingredients and not on formulations. The tentative nature of this interpretation was evidenced by the FDA's further statement in the letter that it would be inviting comments from all interested persons on whether it had "excluded any patents that should have been included or included patents that should have been excluded." (Pfizer's Motion for Summary Judgment, Exhibit C at 4). Upon further consideration, the FDA adopted the position urged by the Pharmaceutical Manufacturers Association and on May 1, 1985, agreed that "the publication requirement includes formulation and composition patents that claim a listed drug product." (*Id.,* Exhibit D). The FDA has not changed that position, which is more beneficial to Pfizer than its original intention of filing patents on active ingredients only. The FDA has never even tentatively endorsed an interpretation of the 1984 Amendments that would require manufacturers to file patent information on unapproved unlisted formulations. Nor has Pfizer shown any inconsistency in the FDA's interpretation of the word drug in § 355(b) to mean drug product.

Accordingly, for the reasons set forth above, it is hereby recommended that the defendant FDA's cross-motion for summary judgment be GRANTED; the plaintiff Pfizer's motion for summary judgment be DENIED; and judgment be entered in favor of the FDA.